UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| DEMECUS HUGHES,<br>    Petitioner,<br><br>vs.<br><br>WARDEN, WARREN<br>CORRECTIONAL INSTITUTION,<br>    Respondent. | Case No. 1:13-cv-534<br><br>Dlott, J.<br>Bowman, M.J.<br><br>**REPORT AND<br>RECOMMENDATION** |

Petitioner, an inmate in state custody at the Warren Correctional Institution in Lebanon, Ohio, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1). This matter is before the Court on respondent's motion to dismiss; petitioner's memorandum in opposition to the motion to dismiss; respondent's reply brief; and petitioner's brief in response to respondent's reply brief. (Docs. 9, 13, 14, 15).[1]

## I. PROCEDURAL HISTORY

### State Trial Proceedings

In July 2002, the Hamilton County, Ohio, grand jury returned an indictment charging petitioner and co-defendant Rodrick Reeves with one count of aggravated murder in violation of Ohio Rev. Code § 2903.01(B), one count of murder in violation of Ohio Rev. Code § 2903.02(A), and one count of aggravated robbery in violation of Ohio Rev. Code § 2911.01(A)(1). (Doc. 9, Ex. 1). Firearm specifications were attached to each count. (*Id.*).

---

[1] Petitioner's unopposed motion for leave to file a response to the respondent's reply brief has been granted by the undersigned in a separate Order issued this date.

The incident giving rise to the charges occurred on June 28, 2002, when Thomas Maddox was shot and killed in the course of a robbery. The Ohio Court of Appeals, First Appellate District, has provided the following summary of the facts that led to the indictment based on evidence presented by the State at petitioner's trial:[2]

> [A]round 3:00 p.m. on June 28, 200[2], Maddox finished cutting grass for Anthony Bowling's lawn-care business. Bowling then drove Maddox to his apartment on Sutter Avenue, where he paid Maddox $165 in cash. Maddox put the money in his pants pocket. When Bowling left the area, Maddox was standing outside his apartment complex and talking with a group of people.
>
> Jermaine Austin, a drug dealer, testified that he saw Maddox get off the bus on Sutter Avenue. Maddox told Austin, who was standing near the local grocery store, that he was going inside to cash his paycheck and buy a phone card. Shortly thereafter, Maddox came to the side of the store and bought marijuana from Austin. During the marijuana buy, Austin testified, he was startled by Hughes, who had walked up behind Maddox and was intently watching the transaction. After the transaction was completed, Austin testified, he saw Maddox walk toward the Marquette Manor apartment complex, with Hughes and Rodrick Reeves following close behind. Austin then saw Hughes and Reeves wrestling with Maddox and trying to get his money. Austin heard a popping sound, but did not learn until later that Maddox had been shot.
>
> Helen Ford, who lived in an apartment on Sutter Avenue, also witnessed Maddox's shooting. During her testimony, Ford wore a baseball cap, which she repeatedly pulled down over her face. She stated several times that she was afraid to testify for fear that something would happen to her. Ford testified that from her apartment window she saw Hughes and Reeves follow Maddox into the grocery store and then follow him outside. Once they were outside, Ford saw Hughes and Reeves wrestling with Maddox, and trying to take something from him. When Maddox resisted, Ford saw Reeves shoot him. Ford testified that she called for emergency assistance and later spoke with the police about the shooting.

---

[2] The state appellate court summarized the facts in its direct appeal decision filed May 20, 2005. (*See* Doc. 9, Ex. 12). 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless the petitioner rebuts the presumption by "clear and convincing evidence." In the absence of clear and convincing evidence to rebut the Ohio Court of Appeals' factual findings quoted herein, those findings are presumed to be correct. *See McAdoo v. Elo,* 365 F.3d 487, 493-94 (6th Cir. 2004).

Abrilla Jacobs, who lived in an apartment across the street from Ford, was also looking out her apartment window when the shooting occurred. Jacobs testified that she saw Hughes and Reeves confront Maddox. Then she heard a gunshot. She saw Maddox, who was struggling with Reeves, fall to the ground, and Reeves and Hughes go through his pockets. Hughes then walked away quickly, while Reeves, who was holding a gun and a paper bag, ran in a different direction. Jacobs called for emergency assistance and then went outside to where Maddox was lying. She spoke with police a few days later. Jacobs testified that she no longer lived on Sutter Avenue.

Kimberly Boatwright testified that she was standing outside her apartment building on Sutter Avenue talking with a friend when she heard some popping sounds and saw Maddox running from the store towards the Marquette Manor apartment complex, with Hughes and Reeves close behind. She saw Maddox fall to the ground. Reeves then stood over him and shot him. Hughes was standing just behind Reeves. She then saw Hughes reach into Maddox's back pocket. Both men then fled from the scene.

When police arrived at the scene, they saw Maddox lying on the sidewalk surrounded by a group of people. They secured the scene, while medical personnel rushed Maddox to the hospital. Maddox was pronounced dead upon arrival. Shortly thereafter, police recovered Maddox's personal effects from the hospital, which included an identification card, a watch, some keys, a small bag of marijuana, and a social security card. An autopsy performed by the deputy coroner revealed that Maddox had two gunshot wounds and several abrasions. One gunshot wound had gone through Maddox's arm, exited, and went back into his chest, causing him to die within seconds to minutes after receiving the wound. The other gunshot wound entered Maddox's upper back and then exited above the ridge of his collarbone. The deputy coroner also found scrapes on Maddox's knuckles, his left elbow, and his buttocks, as well as gun powder residue on his arm. The deputy coroner concluded that Maddox had died of a "hemothorax, which means bleeding into the chest due to gunshot wounds to the torso with perforation of the aorta and lungs."

Back at the crime scene, police found a red shirt that had belonged to Maddox, a white towel, a $10 phone card, a glass vial, two quarters, which were lying next to the phone card, a shell casing in the grassy area between the street and the sidewalk, and a Swisher sweet cigar. Criminalist William Schrand examined the spent shell casing that was found at the scene as well as the bullet removed from Maddox's body. Based on his examination, Schrand concluded that the casing found at the scene was a .22-caliber long-rim-fire cartridge case with a semicircular fire pin impression. Schrand also concluded that the bullet that had

been removed from Maddox's body was a .22 long-rifle hollow-point bullet. Schrand informed police that the murder weapon, which had not been recovered, was most likely a .22 long-rifle-chambered semiautomatic pistol made by Jennings or Bryco.

In addition to collecting physical evidence, the police were able to speak with a number of people at the scene. The following day they obtained a taped statement from Boatwright in which she identified Maddox's assailants as Mecus and Little Roj or Roger. The police also obtained statements from Austin, Ford, and Jacobs. On July 3, Boatwright gave a second taped statement to police. Both Boatwright and Austin identified Hughes from a photographic array.

On July 10, Hughes's father brought him to the District One police station. Hughes was then placed into custody and transported to police headquarters on Broadway Street. After answering some preliminary questions and signing a waiver of his *Miranda* rights, Hughes was questioned about Maddox's murder. Hughes told police that he had been playing basketball with a group of friends on the basketball courts across from the store that afternoon when he heard a gunshot. Hughes said he was running towards the area of the gunshot when he heard a second gunshot. As he approached, he saw Maddox with his left hand partially around Reeves's neck and his right hand down to his side. As he came closer, he observed a brown gun lying on the ground and Maddox gasping for breath. When he asked Reeves what was going on, Reeves did not answer; he just started walking away, crying. Hughes then walked with Reeves across the street, leaving Maddox lying on the sidewalk. Hughes told police that he did not see Reeves with the gun and that he did not know how Maddox had been shot.

(*Id.*, Ex. 12, pp. 2-6).

Petitioner was tried separately from Reeves, who was convicted on all charges and sentenced in March 2003 prior to petitioner's trial in June 2003. (*See id.*, Ex. 14, Attachment B). Following a jury trial, petitioner was found guilty as charged under the theory presented by the State that he "had aided and abetted Reeves in the robbery and murder of Maddox." (*See id.*, Ex. 7 & Ex. 12, p. 7). On June 25, 2003, the trial court sentenced petitioner to an aggregate prison term of thirty (30) years to life, which consisted of consecutive terms of imprisonment of twenty (20) years to life for the aggravated murder offense, three (3) years on the merged firearm

4

specifications attached to the aggravated murder count, and seven (7) years for the aggravated robbery offense. (*Id.*, Ex. 8).³

### State Direct Appeal

With the assistance of new counsel for appeal purposes, petitioner timely appealed to the Ohio Court of Appeals, First Appellate District. (Doc. 9, Ex. 9). In his appellate brief, petitioner asserted the following assignments of error:

1. The judgment of the trial court is contrary to the manifest weight of the evidence.

2. Defendant's conviction is not supported by sufficient evidence.

3. The trial court erred in overruling Hughes' motion to suppress statements made to the police.

4. The trial court erred by denying Hughes' motion to suppress the out-of-court identifications made of him by some of the State's witnesses.

5. Hughes was deprived of his right to a fair trial by the prosecutorial misconduct in the State's closing argument.

(*Id.*, Ex. 10).

On May 20, 2005, the Ohio Court of Appeals overruled petitioner's assignments of error and affirmed the trial court's judgment. (*Id.*, Ex. 12). Petitioner did not pursue an appeal from that decision to the Ohio Supreme Court. (*Id.*, Brief, p. 8 & Ex. 24).

### Delayed Motion For New Trial

On January 28, 2011, over six and one-half years after petitioner's conviction was affirmed on direct appeal, a motion for leave to file a delayed motion for new trial was filed on

---

³ It is noted that for sentencing purposes, the trial court merged (1) the murder charge with the aggravated murder count and (2) the firearm specifications attached to the murder and aggravated robbery counts with the merged firearm specifications for the aggravated murder offense. (*See* Doc. 9, Ex. 8).

petitioner's behalf by an attorney at the Hamilton County Public Defender's Office. (Doc. 9, Ex. 13). In the motion filed pursuant to Ohio R. Crim. P. 33(B), petitioner contended that "[n]ew evidence has come to light in this case," which could not have been discovered "within 120 days of the verdict." (*Id.*). The "new evidence" relied on as support for the motion consisted of: (1) Donta Campbell's testimony that he knew "with certainty" that petitioner was not involved in the robbery or murder of Maddox because "at the exact moment that [he] heard gunfire," Campbell "personally saw" petitioner on a nearby basketball court; and (2) Rodrick Reeves's testimony that petitioner was "nowhere near the scene" of the murder and had "been wrongly convicted for a crime that [Reeves] committed with Michael McCoy." (*See id.*, p. 2 & attached affidavits of Donta Campbell and Rodrick Reeves). In his affidavit, which was executed and notarized on December 10, 2009, Campbell also averred that he "gave this same information to the detectives who interviewed [him] about what [he] witnessed in June 2002"; that he was incarcerated at the Hamilton County Justice Center at the time of petitioner's trial; and that when he later saw petitioner in prison, he asked petitioner "why he didn't call me to testify" and was told that petitioner's trial attorney had said that "I could not be located when I was in fact right there at the jail." (*Id.*, "Affidavit of Donta Campbell"). Petitioner's affidavit was attached to the motion as additional evidentiary support. (*See id.*, "Affidavit of Demecus Hughes"). In that affidavit, which was also executed and notarized on December 10, 2009, petitioner stated in pertinent part:

> [D]uring my trial, I had looked for Donta Campbell to appear in court to testify in my behalf with exculpatory testimony that I know would have changed the outcome of my trial. However, my trial attorney told me that Donta could not be located. . . . I was certainly unavoidably prevented from learning that Donta Campbell was at the Justice Center at that time because I was confined and couldn't have possibly known had not I came across Donta Campbell in prison, which was beyond the time to file for a new trial within the time limits provided by

6

Criminal Rule 33.

(*Id.*).

The State opposed petitioner's motion for leave to file a delayed motion for new trial on the grounds that (1) petitioner had not shown by clear and convincing evidence that he was unavoidably prevented from discovering the allegedly "new" evidence submitted in support of his motion, and (2) such evidence was insufficient to entitle petitioner to a new trial under standards established by the Ohio Supreme Court in *State v. Petro*, 76 N.E.2d 370 (Ohio 1947). (*Id.*, Ex. 14). The State attached exhibits developed during the investigation and prosecution of the case to its brief, including summaries of Donta Campbell's statements to the police in August 2002. (*See id.*).

On July 27, 2011, the same judge who had presided over both petitioner's and Rodrick Reeves's jury trials in 2003 issued an Opinion overruling petitioner's motion for leave to file a delayed motion for new trial. (*Id.*, Ex. 15). The court reasoned in relevant part:

> The defendant herein asserts in his motion that he was unavoidably prevented from presenting the testimony of a witness named Donta Campbell at trial. According to the defendant's affidavit in support of this motion, the testimony of Donta Campbell would have been exculpatory and would have changed the outcome of the trial. Mr. Hughes says he was unable to call Mr. Campbell as a witness because he did not know of his whereabouts at the time of trial. Yet evidence introduced by defendant Hughes on behalf of his motions and the prosecution's evidence in opposition belie Mr. Hughes['] assertions.
>
> Hughes admits in his affidavit that he knew of Campbell's existence as a necessary witness for his case at the time of trial. Yet he did not subpoena the witness nor did Hughes ask for a continuance of the trial so he could secure the presence of a necessary witness. In fact Mr. Campbell had been subpoenaed as a State's witness prior to trial and was noted as a possible witness on the State's witness list which was served on the defendant through counsel. These facts demonstrate Demecus Hughes did not exercise due diligence in trying to acquire the testimony of Mr. Campbell at the time of trial. The defendant offers no viable excuse for his failure

7

of due diligence in the matter of securing the appearance of a necessary witness on his behalf at trial.

In light of the holding in [*Petro*], the defendant would not have been successful in obtaining a new trial based on the alleged "newly discovered evidence" contained in Mr. Campbell's affidavit. If Campbell had been called as a witness at trial his testimony would have been of questionable value in exculpating Mr. Hughes because it is in conflict with his statement to Cincinnati Police who originally investigated the crime. Campbell informed Cincinnati detectives he had been told by Mr. Reeves . . . that Reeves had been involved in the Aggravated Robbery and shooting and Mr. Hughes was in close proximity at the time of the incident. Donta Campbell now denies Hughes was present at the scene of the commission of the crimes of which Hughes and Reeves were convicted. Mr. Campbell's statement as now proffered would simply weakly contradict the trial testimony of four eye witnesses who identified Hughes and Reeves as the perpetrators of crimes of which they were convicted in separate jury trials.

This alleged newly discovered evidence does not disclose a strong probability that the evidence would change the result if a new trial was granted. *Petro* supra. . . .

Defendant Hughes also alleges he was unavoidably prevented from calling his co-defendant Mr. Reeves as a witness on his behalf at trial. Had he been able to have had Mr. Reeves testify at trial, the defendant now alleges Reeves would have testified that Hughes did not participate in the Aggravated Robbery/Murder of which they were convicted.

Once again the trial facts do not support defendant Hughes' allegations. Hughes and Reeves knew each other prior to the time of the robbery.

****

The "Petro" test has six criteria: "The new evidence: (1) discloses a strong probability it will change the result if a new trial is granted; (2) has been discovered since the trial; (3) could not . . . in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to former evidence[;] and (6) does not merely impeach or contradict the former evidence." . . .

Mr. Reeves had been tried and convicted prior to the commencement of Hughes' trial on the charges alleged in the joint indictment. Yet Mr. Hughes maintains he was unavoidably prevented from calling Reeves as a witness at his trial even though Mr. Reeves was incarcerated in the Hamilton County jail at the time of Hughes' trial. Again the defendant had not issued a subpoena to compel Mr.

> Reeves to appear on Hughes' behalf as a defense witness. Neither did Hughes request a trial continuance in order to locate a witness necessary for his defense when his case was called for trial.
>
> Even if Reeves had testified at trial as he now does in his affidavit, that Mr. Hughes did not participate in the Aggravated Robbery/Murder, his testimony would be of limited value in exculpating Hughes. Donta Campbell told Cincinnati police that Reeves told him Hughes was at the scene of the criminal activity for which he and Hughes were convicted. This testimony would have simply contradicted the testimony of four prosecution witnesses who appeared at trial and testified that Hughes participated in the robbery wrestling with the victim prior to the victim being shot by Reeves, and then searching the victim's pockets after Reeves had shot the victim.
>
> So Reeves' testimony would have been insufficient to support a finding there was a strong probability it would have changed the result of the trial.
>
> Demecus Hughes filed this motion almost eight years after his trial and conviction in 2003. He also waited until January 28, 2011 to file this motion even though the affidavits of Reeves and Campbell were signed in . . . 2009. These unexplained delays and continued failures of due diligence preclude the Court from granting leave to the defendant to file a motion for new trial out of time pursuant to Ohio Crim. R. 33(B).

(*Id.*, pp. 3-6).

Petitioner timely appealed to the Ohio Court of Appeals, First Appellate District. (*Id.*, Ex. 16). Assisted by new counsel, he filed an appellate brief in which he asserted as the sole assignment of error that the trial court erred to his prejudice "by abusing its discretion in denying his motion for leave to file delayed motion for new trial" when he had "supplied supporting affidavits that he was unavoidably prevented from discovering newly discovered evidence within the 120 day period prescribed in Crim.R. 33." (*Id.*, Ex. 17).

On May 23, 2012, the Ohio Court of Appeals overruled the assignment of error and affirmed the trial court's judgment. (*Id.*, Ex. 19). The court concluded that the trial court had "properly denied Hughes leave to move for a new trial" because "[t]he court had before it

9

competent and credible evidence to support its determination that Hughes failed to demonstrate by clear and convincing evidence that he had been unavoidably prevented from timely discovering, and from presenting in a new-trial motion, the evidence upon which his new-trial motion depended." (*Id.*).

Petitioner's counsel pursued a timely appeal to the Ohio Supreme Court on petitioner's behalf, raising as the sole proposition of law the same claim that he had presented to the Ohio Court of Appeals. (*See id.*, Exs. 20-21). On September 26, 2012, the Ohio Supreme Court declined jurisdiction to hear the case. (*Id.*, Ex. 23).

**Federal Habeas Corpus Petition**

Petitioner initiated the instant federal habeas action in July 2013. (*See* Doc. 1). In the petition, which is presumed to have been filed on July 30, 2013,[4] petitioner alleges the following claim as the sole ground for relief:

> **GROUND ONE:** Petitioner's due process rights were violated in contravention of the Fourteenth Amendment to the United States Constitution.
>
> **Supporting Facts:** Witnesses provided irrefutable averments that Petitioner did not commit the crime for which he was tried and convicted.

(Doc. 1, p. 6).

In the motion to dismiss filed in response to the petition, respondent argues that the petition should be dismissed with prejudice because it is barred from review by the applicable one-year statute of limitations governing federal habeas petitions, which is set forth in 28 U.S.C. §

---

[4] The filing date of a federal habeas corpus petition submitted by a *pro se* prisoner is the date on which the prisoner provides his papers to prison authorities for mailing. *See Houston v. Lack,* 487 U.S. 266 (1988); *see also Miller v. Collins,* 305 F.3d 491, 497-98 (6th Cir. 2002); *Goins v. Saunders,* 206 F. App'x 497, 499 n.1 (6th Cir. 2006). Petitioner has not indicated when he placed his pleadings in the prison mailing system. However, the earliest he could have done so was July 30, 2013, the date petitioner signed his habeas petition. (*See* Doc. 1, p. 16).

2244(d). (Doc. 9, pp. 12-18). Respondent also contends that petitioner's claim is subject to dismissal because it is either procedurally defaulted or not cognizable in this federal habeas proceeding. (*Id.*, pp. 18-23). Petitioner opposes the motion to dismiss. (Doc. 13). Respondent has filed a brief in response to petitioner's opposition memorandum, and petitioner has filed an additional brief in reply to respondent's response. (Docs. 14-15).

**II. RESPONDENT'S MOTION TO DISMISS (DOC. 9) SHOULD BE GRANTED**

Upon review of the pleadings that have been filed in this case, it appears that petitioner is not challenging the sufficiency of the evidence that was introduced by the State at the June 2003 trial to establish petitioner's guilt on the charges stemming from the robbery and shooting of Thomas Maddox. Instead, petitioner is essentially claiming that Donta Campbell's and Rodrick Reeves's affidavits, which were submitted in support of his January 2011 motion for leave to file a delayed motion for new trial based on newly discovered evidence, establish his innocence and, at least, should have entitled him to a new trial on the criminal charges. (*See* Doc. 1, p. 6; *see also* Docs. 13, 15).

As an initial matter, as respondent has argued in the motion to dismiss, it appears that the petition may be barred from review on procedural grounds. Petitioner procedurally defaulted and thus may have waived any constitutional claim subject to review by this Court because he only argued the issues in the state courts under state-law standards governing new trial motions filed pursuant to Ohio R. Crim. P. 33(B). *See, e.g., Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987) (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)) (to satisfy the "fair presentation" requirement for federal habeas review of state convictions, the "petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state

law"); *see also McMeans v. Brigano*, 228 F.3d 674, 681-82 (6th Cir. 2000). *Cf. Austin v. Mack*, No. 1:03cv323, 2005 WL 1652533, at *3-5 (S.D. Ohio July 11, 2005) (Hogan, M.J.) (Report & Recommendation) (holding that the habeas petitioner waived any claim of constitutional error stemming from the state trial court's denial of his motion for new trial based on newly discovered evidence, because he presented his claims to the state courts "solely 'as state law claims'").[5]

In addition, it appears that petitioner's claim is time-barred under the one-year statute of limitations set forth in 28 U.S.C. § 2244(d), because the facts underlying the ground for relief were discoverable in the exercise of due diligence before petitioner's conviction became final by the conclusion of direct review in 2005 or, in any event, more than a year before Campbell's and Reeves's affidavits were obtained, respectively, in December 2009 and February 2010. The Sixth Circuit has held that the petitioner bears the burden of persuading the court of his due diligence in searching for the factual predicate of his claim. *See, e.g., Stokes v. Leonard*, 36 F. App'x 801, 804 (6th Cir. 2002) (citing *Lott v. Coyle*, 261 F.3d 594, 605-06 (6th Cir. 2001)); *see also McSwain v. Davis*, 287 F. App'x 450, 454-55 (6th Cir. 2008). Here, other than generally averring that he suffered from "adjustment anxiety disorder" when he was transferred to prison immediately after his sentencing in June 2003, petitioner has provided no explanation as to why he did not discover the allegedly exculpatory evidence before the conclusion of direct review in 2005, or what prompted him in 2009 and 2010, seven and one-half years after the final judgment entry of conviction and sentence issued, to finally obtain the affidavits that he claims now demonstrate his

---

[5] This Court's docket records reflect that on August 10, 2005, the District Court entered a final Order and Judgment in *Mack* affirming the Magistrate Judge's Report and Recommendation and denying the petitioner's habeas corpus petition with prejudice. *See Austin v. Mack*, No. 1:03-cv-323-SSB-TSH (S.D. Ohio) (Beckwith, J.; Hogan, M.J.) (Docs. 7-8).

innocence. In light of the silent record, a strong argument can be made that petitioner has not met his burden of demonstrating that Campbell's and Reeves's testimony constitutes newly-discovered evidence for statute of limitations purposes. *Cf. McSwain*, 287 F. App'x at 454-55; *Allen v. Warden, Warren Corr. Inst.*, No. 1:12cv652, 2014 WL 29533, at *1, *6 (S.D. Ohio Jan. 3, 2014) (Litkovitz, M.J.; Beckwith, J.) (and cases cited therein).

In any event, even assuming the claim is not procedurally barred from review on statute-of-limitations or waiver grounds, respondent's motion to dismiss should be granted because petitioner is not entitled to relief based on the merits of his claim.

In this federal habeas case, the Court's review is limited to consideration of claims alleging a violation of "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Claims based on a "perceived error of state law" fall outside the scope of the Court's review and, therefore, do not constitute cognizable grounds for federal habeas relief. *See id.*; *see also Wilson v. Corcoran,* _ U.S. _, 131 S.Ct. 13, 16 (2010) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991)) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris,* 465 U.S. 37, 41 (1984). Therefore, petitioner is unable to obtain relief based on any claim that the state courts erred or misapplied Ohio law in refusing to grant him leave to file a delayed motion for new trial. *Cf. Pudelski v. Wilson,* 576 F.3d 595, 610-11 (6th Cir. 2009) (holding that the petitioner's claim that the "trial court abused its discretion and misapplied Ohio law when denying his motion for new trial based on newly discovered evidence" was "clearly premised on issues of state law," which are "not subject to habeas review"); *Rigdon v. Ohio Adult Parole Authority*, No. 1:08cv716, 2010 WL 3910236, at *11 (S.D. Ohio July 7, 2010) (Wehrman, M.J.) (Report & Recommendation)

(rejecting petitioner's claim that "the trial court erred in its application of Ohio R. Crim. P. 33 or otherwise abused its discretion in denying his motion for new trial" because it involved "issues of state-law only which are not cognizable in this federal habeas proceeding"), *adopted*, 2010 WL 3910230 (S.D. Ohio Oct. 4, 2010) (Dlott, J.).

Furthermore, petitioner has not stated a cognizable ground for relief to the extent he claims that Campbell's and Reeves's affidavits demonstrate his actual innocence. In *Herrera v. Collins*, 506 U.S. 390 (1993), the Supreme Court pointed out that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceedings." *Herrera*, 506 U.S. at 400 (quoting *Townsend v. Sain*, 372 U.S. 293, 317 (1963)). The Court explained:

> This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact.

*Id.* While recognizing that "[o]ur federal habeas cases have treated claims of 'actual innocence,' not as an independent constitutional claim, but as a basis upon which a habeas petitioner may have an independent constitutional claim considered on the merits," the *Herrera* Court nevertheless assumed, "for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 416-17. The Court emphasized, however, that "because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the

enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.* at 417. In a subsequent decision, the Supreme Court declined to answer the question left open in *Herrera*—*i.e.*, whether a freestanding claim of actual innocence constitutes a cognizable ground for federal habeas relief in a capital case, but indicated that *Herrera* "requires more convincing proof of innocence" than that required to obtain review of an independent claim of constitutional error occurring at trial under standards enunciated by the Supreme Court in *Schlup v. Delo*, 513 U.S. 298 (1995). *See House v. Bell*, 547 U.S. 518, 554-55 (2006).

Because the Supreme Court has yet to recognize a freestanding actual innocence claim, the Sixth Circuit has repeatedly ruled that, particularly in the context of a non-capital case such as this, such claims are not cognizable on federal habeas review. *See, e.g., Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) (and Sixth Circuit cases cited therein); *Thomas v. Perry*, __ F. App'x __, No. 13-1681, 2014 WL 128153, at *2 (6th Cir. Jan. 15, 2014); *Sitto v. Lafler*, 279 F. App'x 381, 382 (6th Cir. 2008); *Wright v. Stegall*, 247 F. App'x 709, 711 (6th Cir. 2007); *see also Speer v. United States*, No. 2:12cv277, 2014 WL 1367076, at *2 (S.D. Ohio Apr. 7, 2014) (Marbley, J.) (and Sixth Circuit cases cited therein) (holding that the petitioner was unable to obtain habeas relief based on a freestanding claim of actual innocence because the Supreme Court has never recognized such a claim).

Even assuming solely for the sake of argument that petitioner could bring a freestanding claim of actual innocence based upon newly discovered evidence in this non-capital case, the

15

allegedly "new" evidence proffered by petitioner to establish his innocence falls far short of the "extraordinarily high" threshold showing required by *Herrera* and *House*. As the trial court pointed out in denying petitioner's motion for leave to file a delayed motion for new trial (*see* Doc. 9, Ex. 15), both Campbell's and Reeves's new averments, made years after the police investigation and petitioner's trial, have limited and questionable exculpatory value. Although Campbell now avers that he was present at the scene and saw petitioner on a nearby basketball court when Maddox was killed, in his initial statements to the police in August 2002, he stated that he was not a witness to the crime, but that Rodrick Reeves had told him about shooting and robbing Maddox and, specifically, that "Meecus" had run "up during the robbery" and fled with Reeves "toward Knob CT in English Woods" after money was removed from the victim. (*See* Doc. 9, Ex. 14, Attachment B, PAGEID#: 179-81). Campbell's statements to the police about what was told to him by Reeves also conflict with Reeves's new testimony that he was assisted by Michael McCoy, not petitioner, in the robbery and murder of Maddox. In contrast, strong proof of guilt was introduced at trial through the testimony of four eyewitnesses who identified petitioner as the person who aided and abetted Reeves in the robbery and murder of Maddox. In the face of such testimony, even if a freestanding claim of actual innocence could be considered by this Court, petitioner's belated affidavits are simply insufficient to trigger any constitutional concerns.

Accordingly, in sum, respondent's motion to dismiss (Doc. 9) should be **GRANTED** not only because of the procedural bars to review that petitioner faces, but also because petitioner has not alleged a cognizable claim for federal habeas relief.

**IT IS THEREFORE RECOMMENDED THAT:**

1. Respondent's motion to dismiss (Doc. 9) be **GRANTED**, and petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DISMISSED** with prejudice.

2. A certificate of appealability should not issue in this case because "jurists of reason" would not find it debatable whether petitioner's sole ground for relief "should have been resolved in a different manner" or that the issues presented therein are "adequate to deserve encouragement to proceed further." *See Slack,* 529 U.S. at 483-84 (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore **DENY** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

s/Stephanie K. Bowman
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| DEMECUS HUGHES,<br>    Petitioner, | Case No. 1:13-cv-534 |
| | Dlott, J. |
| vs | Bowman, M.J. |
| WARDEN, WARREN<br>CORRECTIONAL INSTITUTION,<br>    Respondent. | |

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), WITHIN 14 DAYS after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections WITHIN 14 DAYS after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

cbc